Filed 2/16/21  P. v. Castro CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH ANTHONY CASTRO et al.,<br><br>Defendants and Appellants. | C082126<br><br>(Super. Ct. Nos. STKCRFECOD20150006572, SF131593A, SF131593B, STKCRFECOD20150006571) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH ANTHONY CASTRO,<br><br>Defendant and Appellant. | C089047<br><br>(Super. Ct. Nos. STKCRFECOD20150006572, SF131593B) |

Two brothers, defendants Joseph Anthony Castro and Salvador "Alex" Castro,[1] issued threats against Jesse Hernandez and his friend Jorge Rodriguez as the defendants drove by them on a Stockton street. The defendants then drove to Hernandez's residence, where Alex attacked the residence and challenged them to come out. When Hernandez came out, he was attacked by first Alex and then by both defendants, who used golf clubs and/or a fishing rod. Rodriguez came out to help his friend, but Hernandez was fatally stabbed. Following a jury trial, both defendants were convicted of first degree murder (Pen. Code, § 187)[2] with enhancements for personal use of a dangerous or deadly weapon (§ 12022, subd. (b)(1)). The trial court sentenced them each to state prison terms of 26 years to life.

On appeal, Joseph contends there was insufficient evidence to support his first degree murder conviction, raises numerous claims of instructional error, and claims the trial court improperly answered a jury question, counsel was ineffective, the prosecutor committed misconduct, and hearsay was improperly admitted. In a supplemental brief, he contends retroactive application of Senate Bill No. 1437 compels reversal of his murder conviction.

Alex joins several of Joseph's contentions concerning instructional error, as well as the claims regarding ineffective assistance, the jury question, and prosecutorial misconduct. He additionally contends the trial court erred in refusing his request for self-defense and imperfect self-defense instructions. In a supplemental brief, he contends his case must be remanded for a hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

---

[1] To avoid confusion between the codefendant brothers, we refer to them respectively as Joseph and Alex.

[2] Undesignated statutory references are to the Penal Code.

Substantial evidence supports Joseph's first degree murder conviction, the instructions, when read together, were correct or invited by the defense. The court's answer to the jury question was proper, the prosecutor did not commit misconduct by commenting on the evidence, the hearsay was correctly admitted as a prior inconsistent statement, Alex's requested instructions were not supported by the evidence, and counsel was not ineffective for failing to raise futile motions or objections. Finding the *Franklin* claim correct, we shall affirm both convictions and remand Alex's case for a *Franklin* hearing.

BACKGROUND

*The Preceding Confrontation*

Hernandez and his friend Rodriguez met at the Corona Liquor store on the evening of May 30, 2015. Rodriguez bought two or three 25-ounce cans of beer. The pair crossed the street to Taqueria El Grullense, where Hernandez got a burrito. After Hernandez got his burrito, they stood outside the restaurant for several minutes, "just chilling." Their reverie was interrupted when defendants pulled up next to Corona Liquor in a blue, early 2000's Chevrolet pickup truck. Joseph drove and Alex was in the passenger seat. As they pulled up, the two gave Rodriguez and Hernandez "a little look."

Rodriguez was once friends with Alex. They had a falling out in 2014 after Rodriguez's brother was arrested for armed robbery and Rodriguez accused Alex of being a snitch. After the falling out, they got into verbal and physical confrontations. Rodriguez knew Joseph, but not as well. They had exchanged words but never fought each other.

Joseph entered the liquor store and then returned to the truck. He drove down the street and turned right at the intersection. Rodriguez testified that, as the truck passed, Alex leaned out and said, "I'm gonna get both you guys," "We gonna get you both motherfuckers," and that they were going to kill them. He told the police both defendants

3

yelled, "We'll kill you guys."  Rodriguez ran up to the truck and yelled back, "Shut the fuck up," and "Fuck you, motherfuckers."

Cesar Silva was visiting his girlfriend at the home of her mother, Vernita Lymuel, when he saw a man standing on the corner in front of Taqueria El Grullense arguing with two men in a truck.  The man on the corner had his hands in the air and was yelling.  The truck's passenger was sitting on the windowsill of the truck.  The passenger's upper body was out of the window, his hands were up in the air, and he was yelling.  The truck drove by Lymuel's house at about 35 miles per hour.

*The Incident*

Rodriguez and Hernandez stood outside the restaurant for a few minutes and then got some beer at the liquor store to take to Hernandez's apartment.  They did not see defendants or the truck while walking back.  Hernandez entered his home when they arrived, while Rodriguez stayed outside and drank his beer.  Hernandez came back out with marijuana, which they smoked.

Rodriguez heard screeching tires; he looked up and saw the Silverado pickup truck turn onto the street and pull up to Hernandez's apartment.  Alex, the driver, and Joseph got out of the truck; Alex yelled, "I told you we were gonna come back.  We're gonna get you guys."

Defendants approached the residence together.  Hernandez and Rodriguez went inside and locked the door.  There was knocking on the front door.  Alex screamed and demanded them to come outside.  Glass broke, with shards from the front window going into the living room.  Hernandez was angry that his home was being attacked and told Rodriguez to come on.  He then opened the door and went outside.

Rodriguez followed Hernandez about 10 to 15 seconds later.  He saw Hernandez and Alex fighting in the front yard.  They fought a little bit towards the carport, while Joseph stood on the curb looking at Hernandez and Alex.  Rodriguez saw Alex trying to hit Hernandez with a golf club.  Hernandez was on the ground.  Rodriguez grabbed a

4

fishing rod from the front yard and struck Alex in the head with it. Alex and Joseph then ran off to their truck; Alex drove off, with Joseph in the passenger seat.

Lymuel was watering her front yard on the evening of May 30, 2015, when she saw Hernandez and Rodriguez walk by to Hernandez's apartment from the direction of the liquor store. She later heard a car skidding and in less than a minute a man yelled, "Come out of the house, motherfucker," and "Come out of the house right fuckin' now."

After hearing glass break, Lymuel ran across the street toward Hernandez's apartment. She saw a navy blue or black truck facing the wrong way parked in front of Hernandez's apartment. Rodriguez was on the front porch swinging a stick at two Hispanic boys while screaming, "get the hell away." A boy wearing black or blue shorts and wearing a white T-shirt ran around the truck and hopped in the passenger side.[3] The second boy backed up, got into the driver's seat, and drove the two away in the truck. Hernandez was lying on his back; he appeared to be in shock and there was blood on the ground, by his left side. Lymuel called 911.

Jesus Diaz lived in the same triplex as Hernandez. On the night of the incident, he saw Hernandez and Rodriguez walking on the sidewalk towards Hernandez's apartment. Soon thereafter, he heard what sounded like a bomb and glass breaking. Diaz heard yelling outside and someone screaming, "Help, help, help." Diaz went outside, where he saw glass on the ground and a broken window by Hernandez's front door. Defendants' truck was leaving from the front of Hernandez's apartment. Hernandez was on the ground; he was bleeding and Rodriguez was crying and trying to help him.

David Cisneros was playing basketball in the backyard of his friend's house, directly across from Hernandez's apartment. He heard screeching tires followed by fighting and yelling. Cisneros went outside and saw three people fighting in front of

---

**3**    Rodriguez testified that Alex wore a white T-shirt and shorts that night.

5

Hernandez's apartment. One person had what appeared to be a baseball bat in his hands. A fourth man came from around the apartment's corner, yelling at two of the men and trying to fight them off. The two men started fighting the fourth man; they exchanged a few blows and then ran off to a dark blue older model pickup truck parked nearby and left.

Samuel Ojeda was with friends in the same house as Cisneros when he heard glass breaking. He ran outside and saw a man holding a stick or something, banging on the front door of Hernandez's apartment. Hernandez opened the door a few seconds later; there was yelling, but Ojeda could not understand what was said. The man banging on the door and another man beat up Hernandez. The man with the stick used it to strike Hernandez in the head as Hernandez yelled and fought back with his hands up. After a fourth man came out of the apartment to help Hernandez, it broke into two separate one-on-one fights. When Hernandez dropped to the ground by his front door, the man helping Hernandez ran to him while the other two ran to their truck and left.

Richard Moncevais lived near Hernandez. Moncevais was inside his home at around 8:35 or 8:40 p.m. when he heard glass breaking. He opened the front door and saw two to four people fighting in front of Hernandez's porch. He saw them throw punches but did not see any weapons. After the fight, a dark truck parked in front of Hernandez's apartment quickly drove off. Rodriguez frantically yelled that Hernandez was down. Moncevais went over to help and saw Hernandez lying in a large puddle of blood by the front door.

*The Investigation*

The first 911 call was received at 8:37 p.m. Paramedics took Hernandez to the hospital, where he was treated for multiple stab wounds to the chest. He died at the hospital following surgery. The cause of death was the stab wounds, which included two to the heart. Abrasions and contusions on his body and head were consistent with being in a fight around the time of death. He had pattern injuries consistent with being hit with

6

very violent force by a cylindrical object like a rod, and his forearms had defensive wounds. The lack of injuries to the hands suggested they had not been used during the fight. All four stab wounds were inflicted by the same knife.

Surveillance videos from Corona Liquor and Taqueria El Grullense between 8:00 and 9:00 p.m. on the day of the incident showed Hernandez and Rodriguez standing in front of the restaurant for several minutes while drinking. Joseph entered the liquor store at 8:22 p.m., bought a beer, and left. Shortly thereafter, a dark-colored pickup truck drove down the street and turned the corner by the restaurant as a person wearing a white T-shirt hung out of the passenger window. Rodriguez walked to the curb on the corner and watched the truck leave before returning to the front of Taqueria El Grullense. At 8:27 p.m., Hernandez was ordering food in Taqueria El Grullense as Rodriguez held a beer. They got the food and went outside at 8:30 p.m., then entered the liquor store for Rodriguez to buy more beer, leaving at 8:32 p.m. They walked south down the street in the direction of Hernandez's apartment one minute later. A blue pickup truck with a driver wearing a white T-shirt was driving behind the restaurant at 8:34 p.m.

Stockton Police Officer Beau Riley interviewed Rodriguez on the night of the incident. Rodriguez was upset; his breath smelled of alcohol but he could hold a conversation. Rodriguez said that when Hernandez went out to confront the two men, both men tried to hit him with golf clubs. While trying to defend himself, Hernandez knocked down one of the clubs. Rodriguez grabbed the club and used it to strike Alex in the head. He never saw Hernandez get stabbed. Rodriguez later told a detective that he left the house after seeing the two men attacking Hernandez with golf clubs.

Broken headphones and a putter were found in the street in front of Hernandez's apartment. Another golf club was on the lawn near the front door. A broken piece of a fishing rod was near this golf club. The front door of Hernandez's apartment was damaged; the front screen door was caved in with visible indentations, and there were indentations around the deadbolt. The front window next to the door was shattered with

7

the screen on the ground nearby. Two pieces of a broken fishing rod and a third golf club were found in separate parts of Hernandez's apartment.

A swab from the handle of the fishing rod on the lawn contained DNA from Joseph as a major contributor and from Alex as a minor contributor. Hernandez's DNA was found on the pole's shaft. His DNA was also found in blood on the handle of the putter found in the street. DNA from the blood on the putter's shaft matched Alex's. Hernandez's DNA was also found on the handle of the golf club that was on the lawn. A mixed DNA profile of Hernandez and a person unrelated to the incident was on the shaft of this club. DNA from the golf club found in Hernandez's apartment could not be interpreted.

*The Defense*

Alex called Stockton Police Officer Jason Mamaril as an expert on Hispanic street gangs. Rodriguez's brother Edgar Sanchez was a Norteño gang member who had convictions for second degree robbery and assault by means likely to produce great bodily injury with gang and firearm enhancements. The codefendant from Sanchez's case, Gisleno Max Morales, was also a Norteño gang member. Hernandez had gang-related tattoos on his back and right arm, left arm and shoulder, and around his left wrist. He was documented as a Norteño in 2003 following several field interviews. Hernandez's apartment had graffiti related to "East Side Stocktone," a Norteño subset. He had prior convictions for possession of marijuana for sale in 2000 and felon in possession of a firearm in 2005. On cross-examination, Officer Mamaril concluded that there was no gang incident in this case, that Hernandez had no gang-related contacts since 2003, and was never a documented gang member.

DISCUSSION

I

*Sufficient Evidence of Premeditation*

Joseph contends there is insufficient evidence of premeditation to support his conviction for first degree murder as an aider and abettor.[4]  We disagree.

On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560]; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

The mental elements of premeditated first degree murder are likewise well established.  " 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.]  "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.  [Citations.]' [Citation.]  ' "Premeditation and deliberation can occur in a brief interval.  'The test is not time, but reflection.  "Thoughts may follow each other

---

[4]    Alex, who was found to have personally used the murder weapon, a knife, was prosecuted as the principal while Joseph was prosecuted under an aiding and abetting theory.

with great rapidity and cold, calculated judgment may be arrived at quickly." ' "
[Citation.]' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812 (*Solomon*).)  " 'An
intentional killing is premeditated and deliberate if it occurred as the result of preexisting
thought and reflection rather than unconsidered or rash impulse.' [Citation.]" (*People v.
Pearson* (2013) 56 Cal.4th 393, 443.)

"When the crime at issue requires a specific intent, in order to be guilty as an aider
and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to
say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose
and [must] give[] aid or encouragement with the intent or purpose of facilitating the
[direct] perpetrator's commission of the crime.' [Citation.]" (*People v. Lee* (2003) 31
Cal.4th 613, 624.)  Thus, to be guilty of first degree premeditated and deliberate murder
as an aider and abettor, a person must have "aided or encouraged the commission of the
murder with knowledge of the unlawful purpose of the perpetrator and with the intent or
purpose of committing, encouraging, or facilitating its commission.  [Citation.]" (*People
v. Chiu* (2014) 59 Cal.4th 155, 166-167 (*Chiu*).)  "An aider and abettor who knowingly
and intentionally assists a confederate to kill someone could be found to have acted
willfully, deliberately, and with premeditation, having formed his own culpable intent.
Such an aider and abettor, then, acts with the mens rea required for first degree murder."
(*Id.* at p. 167.)  "Because the mental state component—consisting of intent and
knowledge—extends to the entire crime, it preserves the distinction between assisting the
predicate crime of second degree murder and assisting the greater offense of first degree
premeditated murder.  [Citations.]" (*Ibid.*)

The California Supreme Court in *People v. Anderson* (1968) 70 Cal.2d 15
articulated three categories of evidence that could show premeditation and deliberation:
"planning activity, preexisting motive, and manner of killing.  [Citation.]" (*Solomon,
supra*, 49 Cal.4th at p. 812.)  These categories of evidence are not exhaustive, but are
helpful in this case where we find all three are present.  (See *ibid.*)

10

Joseph claims the jury could infer Alex deliberated and premeditated in the time it took him to remove the knife from his pocket and fatally stab his victim, but he claims that was not evidence against Joseph. He finds there was no prior history of him feuding with Hernandez, he did not participate in the angry exchange of words by the restaurant, he was not the person who drove to Hernandez's apartment, he did not chase Hernandez and Rodriguez into the apartment, he did not break the window or bang on the door, he did not call them out, and he did not stab anyone. He further asserts that the evidence does not support any of the categories identified in *People v. Anderson, supra*, 70 Cal.2d 15 as supporting premeditation and deliberation.

Although Hernandez testified that only Alex threatened them when defendants drove by them in front of the restaurant, he told a police officer that both Alex and Joseph said they were going to kill them. While Joseph notes this was disputed by Rodriguez's trial testimony, the jury could nonetheless find the prior inconsistent statement to be more credible, and we will not second-guess that determination on appeal.

The testimony of a single witness can support a conviction unless the testimony is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The officer's rendition of Rodriguez's statement to him is neither, and therefore supports a finding that both Alex and Joseph expressed an intent to kill at this point, before the attack that led to Hernandez's killing. This supports the finding the killing was premeditated and deliberate rather than the product of a rash impulse during the fight.

Although Alex was the primary aggressor, Joseph was a willing participant. After the initial confrontation by the restaurant, Joseph chose to continue to go to Hernandez's residence with Alex after the two changed places as driver and passenger. He did not stay in the truck when Alex came out but came out and approached the apartment with his brother as Alex challenged the retreating Rodriguez and Hernandez to come out of the house. When Hernandez came out in response to the challenges and attacks on his home,

11

there is evidence, the testimony or statements to the police of Rodriguez and Ojeda, that both Alex and Joseph attacked him with weapons, some combination of golf clubs and a fishing rod. Although there is no evidence of how these weapons were procured, Rodriguez testified and told the police that neither he nor Hernandez owned the golf clubs or fishing rod found at the scene, and that both defendants were armed with golf clubs when they arrived. The jury could reasonably infer that both Alex and Joseph brought potentially deadly weapons to a fight and attacked the murder victim with them in a two-on-one assault until Rodriguez intervened. (See *People v. Rhodes* (1989) 215 Cal.App.3d 470, 475 [a golf club can be a deadly weapon], disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 198, fn. 7; see also *People v. Aguilar* (1997) 16 Cal.4th 1023, 1029 [objects not inherently deadly or dangerous may be deadly weapons].) Although Joseph did not deliver the fatal wounds, his previously expressed intent to kill combined with his participation in the attack on Hernandez, showed an intent to help his brother Alex achieve the goal of the deliberate and premeditated murder of the man who had previously accused Alex of being a snitch. Substantial evidence supports Joseph's first degree murder conviction.

## II

*CALCRIM No. 401 and First Degree Murder*

Joseph contends the instruction on aiding and abetting, CALCRIM No. 401, is improper as it did not require an intent to aid and abet a first degree murder.[5]

---

[5] The jury was instructed with CALCRIM No. 401 as follows in pertinent part:

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

12

Joseph notes that the jury was also instructed with CALCRIM No. 520 that defendants were charged with the crime of "murder" and the instruction on lesser included offenses, CALCRIM No. 3517, likewise refers to the charged crime of murder. The jury was also instructed with CALCRIM No. 521 that "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime." Joseph also notes the distinction between first and second degree murder was addressed only as a matter of degree of the single crime of murder. From this, he concludes that, since the instructions allowed the jury to find him guilty of aiding and abetting murder without fixing the degree of the crime, the jury could find him guilty of aiding and abetting a murder without determining he had the necessary mental state for aiding and abetting a first degree murder.

CALCRIM No. 401 gives a correct general definition of aider and abettor liability. Joseph did not raise an objection to CALCRIM No. 401 or seek clarifying language consistent with his contention on appeal, which forfeits the contention. (See *People v. Jones* (2013) 57 Cal.4th 899, 969 [a party " 'may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].) Since Joseph also raises an ineffective assistance claim, we address the contention on the merits.

The problem with Joseph's argument is that "in determining the correctness of jury instructions, we consider the instructions as a whole. [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 49.) We reject his narrow and isolated reading of the instructions and review the adequacy of the instructions in light of the entire charge to the jury. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

The jury was instructed with CALCRIM No. 520 that if it finds the defendant guilty of murder, the murder is second degree "unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521."

13

CALCRIM No. 521 correctly informed the jury the mental state for first degree murder was that defendant "acted willfully, deliberately, and with premeditation."

We must presume the jurors were able to correlate the relevant instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  CALCRIM No. 401 clearly explained the aider and abettor's required mental state, and CALCRIM Nos. 520 and 521 explained the elements of first degree and second degree murder and the requisite mental states for those crimes.  Considered together, the instructions adequately informed the jury that, to find defendant guilty of first degree murder, it had to find defendant personally harbored the mental states of premeditation and deliberation.  Specifically, the instructions directed the jury it could find defendant guilty of first degree murder on an aiding and abetting theory only if the jury found defendant "knew that the direct perpetrator intended to commit" first degree murder, that defendant "intended to aid and abet" the direct perpetrator in committing first degree murder, and that defendant "did in fact aid and abet the perpetrator's commission of" first degree murder.  This is sufficient.

III

*CALCRIM No. 401 and the Formation of Intent*

Joseph next attacks CALCRIM No. 401 by asserting it improperly informed the jury an intent to aid and abet a premeditated murder could be formed during the commission of the murder.  He finds this prejudicially inconsistent with the concept that premeditation must be considered beforehand, and likewise malice must come aforethought.

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.  [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)  CALCRIM No. 401 correctly states the law on this point.  Joseph's failure to seek a clarifying instruction forfeits the contention.

14

We again address the claim on the merits in light of the ineffective assistance claim and his contention that the trial court had a sua sponte duty to issue a clarifying instruction in light of the evidence and prosecutorial argument that Joseph rendered aid at the time of the stabbing.

As discussed in our rejection to Joseph's previous claim, the instructions, read together, required the jury to find defendant premeditated and deliberated before finding him guilty of first degree murder as an aider and abettor. Even assuming premeditation is impossible during (as opposed to before) the commission of the murder,[6] it would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required. (See *Solomon*, *supra*, 49 Cal.4th at p. 812 [" ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection.' " ' "].) In the context of attempted murder, *People v. Lee, supra,* 31 Cal.4th 613, supports this conclusion. There, the Supreme Court stated: "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.] [¶] . . . Where, as in the present case, the natural-and-probable-consequences doctrine does not apply, such an attempted murderer necessarily acts willfully, that is with intent to kill. In addition, he or she also necessarily acts with a mental state at least approaching deliberation and premeditation—concepts that entail ' " 'careful thought and weighing of considerations' " ' and ' " 'preexisting reflection' " ' [citation], as opposed to

---

**6**     This is a generous assumption we make on Joseph's behalf. (See *People v. Hughes* (2002) 27 Cal.4th 287, 371 [" ' " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly' " ' "].)

15

'mere unconsidered or rash impulse hastily executed' [citation]—because he or she necessarily acts with knowledge of the direct perpetrator's intent to kill and with a purpose of facilitating the direct perpetrator's accomplishment of the intended killing." (*Id*. at p. 624.)

The use of the term "during" in CALCRIM No. 401 did not allow the jury to find Joseph guilty of first degree murder without finding the appropriate mental state for the crime. Since the instructions taken together accurately stated the law, there was no sua sponte duty to give a clarifying instruction.

IV

*CALCRIM Nos. 3517 and 640*

Joseph contends it was prejudicial error to give the general instruction on lesser included offense, CALCRIM No. 3517, rather than the homicide-specific lesser included offense instruction, CALCRIM No. 640.

The jury was instructed with CALCRIM No. 3517 in pertinent part as follows:

"If all of you find that the defendant is not guilty of a greater charged crime, you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. A defendant may not be convicted of both a greater and lesser crime for the same conduct. [¶] Now, I will explain to you the crimes affected by this instruction. [¶] Voluntary manslaughter is a lesser crime of murder, charged in Count I."

The Bench Notes to CALCRIM No. 3517 state: "**Do not** give this instruction for charges of murder or manslaughter; instead give the appropriate homicide instruction for lesser included offenses: CALCRIM No. 640 . . . ." (Bench Notes to CALCRIM No. 3517 (2019) p. 1042.)

As pertinent here, CALCRIM No. 640 informs the jury of the two degrees of murder and voluntary manslaughter and states that the trial court will not accept a second degree murder verdict unless the jury first acquits defendant of first degree murder and

16

likewise will not accept a voluntary manslaughter verdict unless the jury first acquits on second degree murder.

Joseph asserts giving CALCRIM No. 3517 was improper because it only required a unanimous decision that the defendant was guilty of murder without requiring unanimity on the degrees of murder.

Joseph's counsel specifically requested CALCRIM No. 3517 and did not ask for CALCRIM No. 640. " 'The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a "conscious and deliberate tactical choice" to "request" the instruction.' [Citations.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 970.) It also applies to defense counsel's tactical decision to forego a particular instruction. (*People v. Wader* (1993) 5 Cal.4th 610, 657-658.) The doctrine of invited error does not apply "in the absence of any clear tactical purpose on defense counsel's part in agreeing" to the instructions given. (*People v. Townsel* (2016) 63 Cal.4th 25, 59.)

CALCRIM Nos. 3517 and 640 and related instructions apply the "acquittal-first" doctrine. (See *People v. Bacon* (2010) 50 Cal.4th 1082, 1110.) "[T]he practice of requiring unanimous acquittal on the greater offense before returning a verdict on the lesser included offense represented an appropriate balancing of interests, protecting a defendant's interest in not improperly restricting the jury's deliberations, and recognizing the state's interest in having the jury grapple with the question of a defendant's guilt of the highest crime charged. [Citation.]" (*People v. Fields* (1996) 13 Cal.4th 289, 304.) The fact this rule implicates different interests of both the prosecution and the defense strongly suggests a tactical reason to modify or forgo such an instruction. Here, defense counsel could have made the tactical decision that giving the general instruction on acquittal-first rather than the homicide-specific one diverts the jury's attention from first degree murder, thus increasing the possibility of a second degree murder or voluntary

17

manslaughter verdict while still retaining the general benefit of the acquittal-first doctrine. Joseph's claim is precluded under the invited error doctrine.

Even if we were to consider Joseph's claim, we would reject it, as any error is harmless.

When an instruction concerning the course of deliberation is erroneous, the defendant challenging the instruction on appeal must show " 'a reasonable probability of an effect on the outcome.' [Citation.]" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1077, fn. 7, overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) "Whether and when an erroneous instruction imposing an acquittal-first rule would be reversible is a difficult question." (*Berryman*, at p. 1077, fn. 7.) "[I]t will likely be a matter of pure conjecture whether the instruction had any effect, whom it affected, and what the effect was." (*Ibid.*)

Such is the case here. The jury was properly instructed on the distinction between first and second degree murder, that murder was second degree unless it found beyond a reasonable doubt that the People proved the elements of first degree murder, and on aider and abettor liability. Since it found Joseph guilty of first degree murder as an aider and abettor, and the evidence supports that verdict, any error in giving CALCRIM No. 3517 was harmless.

V

*CALCRIM No. 403 and Chiu*

Joseph's next attack on the instructions involves CALCRIM No. 403, which he claims violated the principles announced in *Chiu*.

The Supreme Court held in *Chiu, supra*, 59 Cal.4th 155, that an aider and abettor of a target offense may not be convicted of first degree murder under the natural and probable consequences doctrine. Instead, "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that

would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id.* at p. 166.)

The jury was instructed pursuant to CALCRIM No. 403 that a murder conviction could be based on aiding and abetting or participating in an assault with a deadly weapon if the murder was a natural and probable consequence of the assault. The trial court appended the following sentence at the end of the instruction: "If you find a defendant is guilty of murder under the natural and probable consequences doctrine, you are instructed that it is murder in the second degree." According to Joseph, since the instructions for CALCRIM Nos. 520 and 521 provided for elevating second degree murder to first degree murder, the modified CALCRIM No. 403 did not prevent the jury from convicting him of murder under the natural and probable consequences theory in violation of *Chiu*. He claims the opening sentence of the CALCRIM No. 403 instruction, "Before you may decide whether the defendant is guilty of murder, you must decide whether he is guilty of assault with a deadly weapon," told the jurors the natural and probable consequences theory was the first step in climbing the ladder leading to first degree murder. He asserts the admonishment at the end of the instruction could easily be understood to mean the doctrine establishes at least second degree murder, but may still be elevated to first degree murder if the elements of first degree murder are met as well.

Joseph did not object to the modified instruction. We address the merits because his claim of a legally incorrect instruction potentially affects his substantial rights, bypassing forfeiture (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927), and because he raises an ineffective assistance claim for trial counsel's failure to object.

As previously discussed, the jury was instructed under CALCRIM No. 520 that if it finds defendant guilty of murder, the murder is second degree "unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521," and was correctly instructed under CALCRIM No. 521 that first degree murder could be found only if the defendant "acted willfully, deliberately, and

with premeditation." Furthermore, nothing in the admonition appended to CALCRIM No. 403 would allow the jury to find first degree murder under a natural and probable consequences theory. The phrase, "If you find a defendant is guilty of murder under the natural and probable consequences doctrine, you are instructed that this is murder in the second degree" is clear. Murder under a natural and probable consequences theory must be second degree murder.

Since the instructions specifically limited first degree murder to premeditated and deliberate murder, since murder was second degree unless the jury found it to be first degree under this definition, and since the modification at the end of CALCRIM No. 403 was clear, there is no chance the jury would use the modified CALCRIM No. 403 to find Joseph guilt of first degree murder under a natural and probable consequences theory as an aider and abettor.

VI

*Conspiracy, CALCRIM No. 417, and Chiu*

Joseph claims the instruction on conspiracy, CALCRIM No. 417, also violated *Chiu* as it failed to include any qualifying language on the portion of the instruction addressing natural and probable consequences for conspiracy.

Over defense objection the jury was instructed with CALCRIM No. 417 on liability for coconspirator acts. As relevant here, the instruction states:

"A member of a conspiracy is criminally responsible for the crimes that he conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act by any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider

20

all of the circumstances established by the evidence. [¶] . . . [¶] To prove that the defendant is guilty of the crime charged in Count 1, murder, the People must prove that: [¶] 1. The defendant conspired to commit one of the following crimes: Murder or assault with a deadly weapon as to [Hernandez] [¶] 2. A member of the conspiracy committed murder to further the conspiracy; [¶] AND [¶] 3. Murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit."

Joseph argues that, in light of the specific admonition limiting CALCRIM No. 403 to second degree murder, and the lack of one in CALCRIM No. 417, the jury was given the impression that the rule limiting murder under a natural and probable consequences theory to second degree murder applied only to CALCRIM No. 403 and not to CALCRIM No. 417. Since the title of CALCRIM No. 417 refers to natural and probable consequences, Joseph concludes the jury would conclude conspiracy liability was not subject to the limitation given in CALCRIM No. 403, and the jury could therefore find him guilty of first degree murder under a natural and probable consequences theory as a conspirator pursuant to CALCRIM No. 417.

"For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 777, disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.) In making this determination, we use the same principles applied to other claims of instructional error, we presume the jury followed and understood the instructions, and considered the instructions as a whole, not simply a single instruction or isolated parts of an instruction. (*People v. Harrison* (2005) 35 Cal.4th 208, 252; *People v. Morales* (2001) 25 Cal.4th 34, 47; *People v. Holt* (1997) 15 Cal.4th 619, 677.)

CALCRIM No. 417 does not address degrees of murder, but CALCRIM Nos. 403, 520, and 521 do. Those instructions make clear that murder under a natural and probable

consequences theory must be second degree murder, murder is second degree unless the People prove beyond a reasonable doubt the elements of first degree murder, and a first degree murder has the mental state of premeditation and deliberation. Read together, and presuming the jury reasonably applied them, the instructions inform the jury that while Joseph may be liable for the natural and probable consequences of any conspiracy he belonged to, a conviction for murder as a natural and probable consequence of assault with a deadly weapon must be second degree murder.

It was not error to give CALCRIM No. 417 in this unmodified form.

VII

*CALCRIM No. 416 and "Evidence of a Conspiracy"*

Over defense counsel's objection, the trial court gave CALCRIM No. 416, which begins as follows: "The People have presented evidence of a conspiracy." Joseph, joined by Alex, claim this improperly tells the jury the People presented evidence of a conspiracy. They argue this phrase improperly invaded the jury's province, resolved a contested issue of fact in the People's favor, and was improperly argumentative.

In addition to this first sentence, CALCRIM No. 416 also informed the jury of the People's burden to prove the four elements of conspiracy. The instruction tells the jury it must decide whether the defendant committed the required overt act and that "[t]he People must prove that the members of the alleged conspiracy had an agreement and intended to commit murder or assault with a deadly weapon" as to the victim. The jury was also instructed pursuant to CALCRIM No. 416, "You must decide as to each defendant whether he was a member of the alleged conspiracy."

A similar challenge to CALCRIM No. 416 was rejected in *People v. Williams* (2008) 161 Cal.App.4th 705 (*Williams*). As in here, the defendant in *Williams* claimed the instruction's title and opening portion displaced the jury's function by directing it find a conspiracy and lessened the People's burden of proving the conspiracy. (*Id*. at p. 709.) The Court of Appeal found CALCRIM No. 416 did not direct the jury to find a

22

conspiracy existed. (*Williams,* at p. 710.) Rather, "it provides an explicit description of the elements of conspiracy that the prosecution must prove," and "includes clear language explaining that it is for the jury to decide whether the prosecution has proved the elements of conspiracy." (*Ibid.*) According to the Court of Appeal, "rather than directing the jury to find that a conspiracy existed, CALCRIM No. 416 instructs the jury to decide whether the prosecution proved the elements of a conspiracy as well as whether the defendant was a member of the conspiracy." (*Ibid.*)

We agree. CALCRIM No. 416 does not usurp the jury factfinding function nor does it lessen the burden of proof. The opening sentence provides the jury with context with why this instruction is being given. The remainder correctly sets forth the elements of conspiracy, the People's duty to prove them, and how the jury is to determine whether the People have carried the burden of proving a conspiracy. Nothing more is needed.

Defendants attempt to distinguish *Williams* by claiming it did not address two arguments they present here, that CALCRIM No. 416 was unduly argumentative and it provides an essential link in the chain of circumstantial evidence that the People were required to prove. Neither argument has merit. As the instruction did not usurp the jury's role as factfinder, and did not specifically address circumstantial evidence, it did not provide a link in a chain of circumstantial evidence. " 'An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law.' [Citation.]" (*People v. Battle* (2011) 198 Cal.App.4th 50, 85.) It is also " 'an instruction "of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." ' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 486.) CALCRIM No. 416, which instructs the jury on its duty to determine whether an uncharged conspiracy exists in evenhanded, nonpartisan terms, did no such thing.

23

VIII

*Jury Question on Degrees of Murder*

Joseph (joined by Alex) contends the trial court improperly answered a jury question regarding the difference between first and second degree murder.

A. *The Answer*

During deliberations, the jury sent a written question to the trial court seeking "clarification between 1st and 2nd degree murder." The trial court gave an oral response. It first directed the jury to CALCRIM No. 500 on homicide, and said murder was an unlawful killing with malice aforethought. It then told the jury, "If you find the defendant is guilty of murder, then you have to decide if it is first-degree or second-degree," and said first degree murder required premeditation while second degree murder did not.

The answer continued with a "classic" example of second degree murder: "someone walks up to somebody on the street and just kills them, they don't—no prior contact whatsoever, they just kill them. Absolutely no premeditation or deliberation." The court next stated manslaughter was a lesser included offense of murder which the jury would have to consider if it found not guilty on murder. The court next addressed CALCRIM No. 520, the elements of murder, explaining the difference between express and implied malice. It gave the following "classic example" of implied malice: "a person has a gun and sees a passenger train going by on the tracks and he doesn't necessarily intend to kill anybody, he doesn't know anybody on the train, but he just fires at the windows, bang, bang, bang, bang. Now that would be—or could be implied malice. In other words, it's conscious disregard for human life."

The court continued discussing malice aforethought and causation. It next told the jury that murder is in the second degree unless the People prove beyond a reasonable doubt first degree murder as defined in CALCRIM No. 521, and then set forth the requirements for first degree murder in CALCRIM No. 521. The court concluded its

24

response by going over the natural and probable consequences doctrine and said natural and probable consequences murder was always in the second degree.

B. *Contentions*

Defendants contend the response was prejudicially inaccurate and argumentative. They note the jury asked only for the difference between the two degrees of murder, and claim the trial court should have focused its response to the elements the People must prove to overcome the presumption of second degree murder, as shown in CALCRIM No. 521. Admitting the trial court correctly referenced CALCRIM No. 521, they contend the court confused the jury by giving examples of second degree murder. According to defendants, the examples were of no use to the jury and obfuscated the concept that second degree murder is included in first degree murder, and that every first degree premeditated murder is also a second degree murder.

Defendants also find fault with the trial court's statement, "If you find the defendant is guilty of murder, then you have to decide is it first-degree or second-degree." They find this improperly presents the issue as a binary, either/or proposition in which the jury must select between one, which is incorrect because second degree murder is presumed unless the People prove first degree murder beyond a reasonable doubt. The defendants also find this improperly allowed the jury to find first degree murder by negating second degree murder. Defendants claim the rest of the response reinforced this problem, as it involved an extended discussion of second degree murder, including examples of what would be second degree murder. According to defendants, these examples properly belong in arguments of counsel to the jury rather than in the instructions. They conclude the response was an abuse of discretion.

Defendants did not object to the trial court's response, forfeiting the contention on appeal. (*People v. Boyette* (2002) 29 Cal.4th 381, 430.) We address the merits in light of the ineffective assistance claim.

25

C. *Analysis*

When a jury asks a question after retiring for deliberation, "[s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law. [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 985, fn. omitted.) "[U]nder section 1138 the court must attempt 'to clear up any instructional confusion expressed by the jury.' [Citation.]" (*People v. Giardino* (2000) 82 Cal.App.4th 454, 465.) "This means the trial 'court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1015.)

The trial court's decision to instruct or not to instruct a deliberating jury is reviewed under the abuse of discretion standard. (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.) A claim that the substantive information conveyed was inaccurate is a question of law, which we review de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

In essence, the trial court went over most of the relevant legal principles regarding murder, during which it correctly set forth the differences between first and second degree murder and that murder was deemed second degree murder unless the People carried its burden of proving first degree murder, and intermixed examples of express and implied malice second degree murder. Most importantly, the court told the jury all murder was second degree murder unless the People proved first degree murder and then discussed the CALCRIM No. 521 definition of first degree murder. When viewed as part of the entire response, the examples of second degree murder and implied malice given by the trial court were not confusing, argumentative, or an abuse of discretion in any other way. The response was within the court's discretion.

26

IX

*Ineffective Assistance*

As already noted, Joseph asserts the failure to object to the various instructions and the response to the jury question he attacks on appeal constitutes ineffective assistance. Alex joins this as to the claim regarding the trial court's response to the jury question.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

We will not reverse for ineffective assistance if there was a reasonable tactical reason for counsel's action. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Likewise, it is not ineffective assistance of counsel to refrain from performing futile acts. (See *People v. Price* (1991) 1 Cal.4th 324, 387.) As previously discussed, every claim where trial counsel did not object was either denied on the merits, involved invited error, or did not prejudice defendants. Thus, every claim of ineffective assistance involved either attacking a valid tactical choice by counsel, requiring counsel to take the futile act of objecting to a correct instruction or response to the jury question, or was not prejudicial. Defendants' claims of ineffective assistance are without merit.

X

*Misconduct in Closing*

Joseph, joined by Alex, contends the prosecutor committed misconduct in the closing argument by misstating the burden of proof.

As defendants acknowledge, trial counsel failed to object to the statements now challenged on appeal. That forfeits the challenge. (See *People v. Wrest* (1992) 3 Cal.4th 1088, 1105 ["by failing to interpose any objection at trial, defendant waived any error or

27

misconduct emanating from the prosecutor's argument that could have been cured by a timely admonition"].) Defendants also claim it was ineffective for their attorneys to fail to object.

A. *Prosecutor's Argument*

During the closing argument, the prosecutor stated that the jury could not use circumstantial evidence to prove "specific intent to kill" if "it's just impossible." The prosecutor continued: "[T]he law will instruct you that if there are two reasonable conclusions in regards to circumstantial evidence only to prove the mental state necessary—in this case the People have to prove and have proven the specific intent to kill. But in order for you to find the circumstantial evidence proves that intent, like I said, if you find that the circumstantial evidence is impossible to prove that, you cannot use it. [¶] The law will also say if there are two reasonable interpretations, meaning one reasonable interpretation points to guilt and one reasonable interpretation points to innocence, you must adopt the interpretation that points to innocence. However, the law will also tell you that you must reject the unreasonable. So you must be convinced that the only reasonable conclusion supported by the circumstantial evidence to prove intent or mental state is that the defendant is guilty. If you can draw two or more reasonable conclusions. However, you must accept only reasonable conclusions and reject the unreasonable. And in this particular case, you must reject any unreasonable argument and you must adopt reasonableness, in this case, to prove the state of mind to prove that they are guilty of murder. [¶] That's what this case does."

Toward the end of closing, the prosecutor stated: "[A]s to both of these defendants, the only reasonable verdict, based upon the facts, based upon the law, is that

28

they are both guilty of murder, the premeditated deliberate and willful murder" of Hernandez and assault on Rodriguez.**7**

During rebuttal, the prosecutor stated: "You know, and it's interesting. Have you not detected and noted that through the course of every single legal tenant is reasonableness? It must be reasonable. That's why it's proof beyond a reasonable doubt, not proof beyond all imaginary or possible doubt. Because everything in life is open to some possible or imaginary doubt."

B. *Analysis*

"A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct 'that does not render a criminal trial fundamentally unfair' violates California law 'only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citations.]" (*People v. Harrison, supra,* 35 Cal.4th at p. 242.) "[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging

---

**7** In addition to the murder charge, both defendants were charged with and acquitted of assault with a deadly weapon (a golf club) as to Rodriguez.

meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).) The court must consider the challenged statements in the context of the argument as a whole to make its determination. (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159.)

Defendants claim the prosecutor committed misconduct by arguing the jury must adopt reasonableness as proof of the mental state required for murder, and by that finding defendants guilty of first degree murder was the only reasonable verdict. They claim this was improper as it strongly suggested that the People satisfied their burden of proof by presenting circumstantial evidence that supported a reasonable theory of guilt, and by showing that innocent explanations were unreasonable.

"[I]t is error for the prosecutor to suggest that a 'reasonable' account of the evidence *satisfies the prosecutor's burden of proof.*" (*Centeno, supra,* 60 Cal.4th at p. 672.) However, it is proper to urge the jury to consider all the evidence before it, "to urge that a jury may be convinced beyond a reasonable doubt even in the face of conflicting, incomplete, or partially inaccurate accounts," and "to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory." (*Ibid.*) It is also proper for the prosecutor to ask the jury to " 'decide what is reasonable to believe versus unreasonable to believe' and to 'accept the reasonable and reject the unreasonable.' " (*People v. Romero* (2008) 44 Cal.4th 386, 416.)

Defendants find the prosecutor's argument comparable to the one in *Centeno*. There, the prosecution used descriptions of a state, suggesting that the state was California, even though some of the descriptions of California were incomplete and inaccurate. The prosecutor argued that, despite the incomplete and even inaccurate descriptions, it was clear beyond a reasonable doubt that the state described was California. (*Centeno, supra*, 60 Cal.4th at pp. 665-666.) The prosecutor also argued the jury's decision "has to be based on reason. It has to be a reasonable account," and argued

30

defense theories were "unreasonable" while the People's theory was "reasonable." (*Id*. at p. 666.) The prosecutor further argued that it was reasonable to believe the complaining witness's testimony that the defendant abused her and it was reasonable that the defendant was " 'good for it.' " (*Id.* at p. 672, italics omitted.) The Supreme Court concluded this was prejudicial misconduct and reversed, even though the issue had been forfeited, because trial counsel's failure to object violated the defendant's right to counsel. (*Id.* at pp. 674, 677.)

In *Centeno*, the Supreme Court found objectionable the prosecutor's visual presentation coupled with the hypothetical accompanying it. "What occurred here was not the legitimate marshaling of evidence with charts outlining the facts or relating them to the legal concepts explained in the jury instructions. Instead the prosecutor offered a theoretical analogue, unrelated to the evidence, purporting to relate the exacting process of evaluating the case to answering a simple trivia question." (*Centeno, supra*, 60 Cal.4th at p. 671.) The prosecutor's discussion of reason and what was reasonable was improper because it "confounded the concept of rejecting unreasonable inference with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden." (*Id*. at p. 673.)

Unlike the prosecutor in *Centeno*, the prosecutor here did not use visual aids or any other means to introduce extraneous evidence through closing argument. The argument before us does not involve an improper hypothetical which analogizes the proof beyond a reasonable doubt standard to answering a trivia question. The prosecutor correctly admitted that the jury must accept a reasonable inference supporting innocence even if there was a reasonable inference supporting guilt, then properly urged the jury to reject unreasonable inferences. (See *Centeno, supra*, 60 Cal.4th at p. 672 [prosecutor can properly urge jury to decide what is reasonable to believe and reject the unreasonable].) The phrase, "So you must be convinced that the only reasonable conclusion supported by

31

the circumstantial evidence to prove intent or mental state is that the defendant is guilty," is not problematic when considered in the context it was made, during an argument asking the jury to reject an unreasonable inference in light of a reasonable inference, and that if reasonable inferences support both guilt and innocence, then the innocent inference must be accepted. Understood in this context, the prosecutor is attempting to explain reasonable doubt and to differentiate it from the absence of any doubt, whether reasonable or not. This argument is likewise proper, as reasonable doubt is not the same as any doubt. (See § 1096 [reasonable doubt is not possible or imaginary doubt].) There was no misconduct.

Since the prosecutor did not commit misconduct, any objection would have been futile, and the failure to object was not ineffective assistance.

XI

*Misconduct in Rebuttal*

Joseph contends the prosecutor committed misconduct and *Griffin*[8] error in rebuttal regarding defense arguments concerning the DNA evidence, and counsel was ineffective for failing to object.

A. *Testimony and Rebuttal*

The prosecution presented DNA testimony that a swab from the fishing rod handle produced a trace DNA mixture with a major profile matching Joseph and a minor profile matching Alex. The expert admitted on cross-examination that she could not tell when defendants actually touched the fishing rod.

Joseph's defense counsel then asked the following hypothetical of the expert: "So perhaps Joseph Castro could have been fishing one day, used the pole, it's a hot day, you're fishing, you get sweaty, excrete your DNA onto the fishing pole, and Salvador

---

[8]     *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106] (*Griffin*).

32

Castro then uses it at a later date?" The expert agreed this was possible. On redirect, the prosecutor asked hypothetically whether the DNA could have been deposited at the crime scene by defendants. The expert agreed this was possible.

In closing, Joseph's counsel argued over the prosecutor's objection that Joseph's DNA found on the fishing rod was trace DNA deposited on the pole when Joseph went fishing.

The prosecutor's rebuttal addressed this as follows:

"And then you have to believe, oh, okay, the defendants didn't bring the golf clubs, but they brought a fishing rod. So they didn't bring the golf clubs, but they did bring a fishing rod, which is about as random as you can get. Again, they have to be able to explain how the DNA got on there. And by the way, there is absolutely no evidence before you that Joseph Castro ever was out on some sunny day fishing. But what that does prove is is [*sic*] not only was he out there, not only did he have his hands all over that item of evidence, not only does that belong to them, along with the other items, you're gonna see what you're instructed and you're going to look at the instruction in regards to expert witnesses. And there was this whole scenario, you know, we're hanging out on a nice warm day, you know, and we're fishing, could somebody's DNA get on there. You're going to look in the instruction that is going to say a hypothetical that is posed to an expert must be facts that are proven in the course of the case. Those facts were never presented in this case, ladies and gentlemen; therefore, there can be no viable expert opinion on that.

"So recall when the People asked the expert the opinion as to whether or not a person's DNA could be deposited on that fishing rod as a result of holding it, violently swinging it, and possibly breaking a window, or otherwise used as a weapon. Those are facts that have been proven in the course of this case." No objection was made to this argument.

B. *Analysis*

Joseph asserts the argument improperly reversed the burden of proof. According to Joseph, it was reasonable to infer that both defendants touched the fishing rod before it was brought to the scene of the crime, and the fact that Joseph's DNA was found on a fishing rod belonging to him and his brother was not evidence that he used the pole as a weapon against Hernandez. Joseph likens the DNA evidence to fingerprint evidence, and notes a defendant has no duty to explain the presence of his fingerprints on an item. He finds the prosecutor, by arguing about the absence of any evidence supporting the defense hypothetical, improperly reversed the burden of proof. He also claims this argument is an improper comment on his failure to testify, a violation of *Griffin*.

The failure to object forfeits his claims of misconduct and *Griffin* error. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1050.) Finding the prosecutor's argument was proper, we conclude counsel's failure to object did not constitute ineffective assistance.

Under *Griffin*, the prosecution may not comment on a defendant's failure to testify. (*People v. Gomez* (2018) 6 Cal.5th 243, 299.) Nor may the prosecution argue that certain testimony or evidence is uncontradicted, if only the defendant could deny or contradict it. (*Ibid*.) But nothing precludes the prosecution from commenting on the state of the evidence. (*Ibid*.) And " 'brief and mild references to a defendant's failure to testify without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error.' [Citation.]" (*People v. Turner* (2004) 34 Cal.4th 406, 419-420.)

"A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) The prosecutor did not comment on any defendant's failure to testify or claim the defendant had the burden of proof. Rather, the prosecutor engaged in fair commentary on the evidence to undercut

34

the hypothetical presented by Joseph's counsel for which there was no evidentiary support. The prosecutor may fairly respond in rebuttal to arguments made by defense counsel. (*People v. Bryden* (1998) 63 Cal.App.4th 159, 184.) The argument here was not misconduct or *Griffin* error. It was a proper response to arguments from defense counsel, and counsel was not deficient in declining to object.

XII

*Prior Inconsistent Statement*

Joseph next claims hearsay evidence was improperly admitted as a prior inconsistent statement and trial counsel was ineffective for failing to object to it. One of the witnesses to the murder, Samuel Ojeda, was asked on direct whether he could see if the second assailant (Joseph) had anything in his hands when he attacked the guy that came out of the house (Hernandez). Ojeda replied, "Nah. I don't remember." He earlier testified that he saw Alex hit Hernandez with a stick. When asked on redirect whether he told an officer that two unknown suspects armed with sticks were beating the victim, Ojeda replied, "Well, I don't remember both of them were armed with sticks, but I know at least one of them had one."

Following Ojeda's testimony, the prosecutor called Stockton Police Officer Mark Afanasev. Officer Afanasev was allowed to testify, over defense counsel's hearsay objection, regarding a prior inconsistent statement made by Ojeda, in which he told Officer Afanasev that "there were two suspects armed with sticks hitting the victim in the head."

Joseph asserts that Ojeda's statement to Officer Afanasev was improperly admitted because it was not inconsistent with Ojeda's testimony. Recognizing trial counsel made a general hearsay objection to the testimony, he nonetheless claims counsel was ineffective in failing to support the objection with proper argument and by not moving to strike the evidence.

35

Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing . . . ."

"The 'fundamental requirement' of [Evidence Code] section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony. [Citation.]" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219.) "A trial court's decision to admit or exclude evidence is a matter committed to its discretion ' "and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 585.)

" ' "Generally it is true that the testimony of a witness indicating that he or she does not remember an event is not inconsistent with a prior statement describing the event. [Citation.] But justice will not be promoted by a ritualistic invocation of this rule of evidence. Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement [citation], and the same principle governs the case of the forgetful witness." ' [Citations.]" (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1075-1076.)

A victim's testimony that she did not remember one act of oral copulation on her by the defendant when she was younger than eight was inconsistent in effect with prior statements to a detective with earlier dates of oral copulation she had told the detective. (*People v. Thomas, supra*, 15 Cal.App.5th at p. 1076.) It was likewise proper to admit a detective's testimony about a sexual assault victim's prior statement that the defendant told her "this 'wasn't the first time he had done this' " when the victim testified she did not " 'remember' " if the defendant " 'said specifically that he had done it before.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1008-1009.) The same is true here. Ojeda remembered the incident and many details, including the fact that the initial assailant, Alex, attacked the victim with a golf club and that the second assailant, Joseph, joined

him in the attack. Asked if he remembered telling Officer Afanasev that both assailants used sticks on the victim, Ojeda did not directly respond to the question, but instead answered that he did not remember if both of them were armed with sticks but knew the first assailant was. This was inconsistent in effect with Ojeda's prior statement to the detective that both men used sticks in the assault.

It was not an abuse of discretion to admit the statement to Officer Afanasev as a prior inconsistent statement. Since the statement was properly admitted, trial counsel was not ineffective for declining to do the futile acts of making additional argument against the statement or moving to strike it.

XIII

*Instruction on Involuntary Manslaughter*

Alex's counsel requested instructions on voluntary manslaughter and involuntary manslaughter. Asked if she was requesting manslaughter as well, Joseph's counsel replied, "No, but I'm not objecting to it." When the trial court asked if she was joining the request for involuntary manslaughter instruction, Joseph's counsel replied, "No, Your Honor." The trial court rejected Alex's request for an involuntary manslaughter instruction.

Joseph contends it was error not to instruct the jury on involuntary manslaughter with respect to him as an aider and abettor.

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. [Citation.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) "A trial court must instruct the jury sua sponte on involuntary manslaughter as a lesser included offense of murder where, 'there is substantial evidence that the defendant committed the lesser included offense, which, if accepted by the trier of fact, would exculpate the defendant from guilt of the greater offense.' [Citation.]" (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1371.) In reviewing whether the trial court had a sua

37

sponte duty to instruct the jury on a lesser included offense, we construe the evidence in the light most favorable to the appellant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

Manslaughter is the unlawful killing of a human being without malice. Involuntary manslaughter is a killing occurring during the commission of "an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) This encompasses an unintentional killing in the course of a felony that is not inherently dangerous without due caution or circumspection. (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, overruled on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 88-91.) An instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 33-34.)

However, "when, as here, the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter. [Citations.] Otherwise, an involuntary manslaughter instruction would be required in every implied malice case regardless of the evidence." (*People v. Brothers, supra*, 236 Cal.App.4th at p. 35.)

Joseph argues that if the jury believed that he aided Alex's criminal behavior but lacked malice when he did so, it could believe Joseph aided and abetted Alex in assault with a deadly weapon against Hernandez, thereby making him guilty of involuntary manslaughter. He points out that he had no beef with the two victims and appeared to be uninterested in the initial confrontation in front of the restaurant. Joseph also finds the

38

testimony of Rodriguez and Ojeda supports involuntary manslaughter by portraying him as a reluctant participant, and then doing so only briefly. In particular, he relies on Rodriguez's statement to law enforcement that Hernandez knocked one of the weapons out of his two assailant's hands and Ojeda's answer on cross-examination that he did not know if the other person (Joseph) was trying to break up the fight. From this, he concludes the evidence could support a finding that Alex was the aggressor and he interceded only briefly to protect his brother.

Viewing the evidence in the light most favorable to a lesser included offense instruction, it is apparent that Joseph deliberately engaged in an aggravated assault, the natural and probable consequence of which was inherently dangerous to human life. Even assuming Joseph did not threaten to kill Hernandez and Rodriguez when he and Alex drove by them, it cannot be disputed that Joseph knew Alex made the threat to kill yet nonetheless continued to ride in the truck with him to Hernandez's house.[9] While Joseph may not have joined his brother in assaulting Hernandez's home, he got out of his truck and later came to his brother's aid while Alex was assaulting Hernandez with a deadly weapon, a golf club, and that Hernandez was unarmed.[10] While there is some dispute in the evidence as to whether Joseph used a weapon or what type of weapon he employed, there can be no dispute that Joseph joined Alex in fighting Hernandez as Alex was assaulting Hernandez with a weapon. Notwithstanding Joseph's claims to the contrary on appeal, there is no evidence he sought to protect his brother. Ojeda's

---

[9] After taking time to switch drivers, as the undisputed evidence shows Joseph was the driver during the first encounter but Alex drove the truck to Hernandez's home.

[10] Although Hernandez's DNA was found on two of the golf clubs and the fishing pole, the forensic testimony shows that his wounds were exclusively defensive and there is no eyewitness or video evidence of him employing a weapon; all such testimony was that defendants were the only ones to employ the golf clubs or the fishing rod as weapons.

statement that he did not know if Joseph was trying to stop the fight shows a lack of knowledge rather than creating a disputed fact as to Joseph's intervention. Since all other evidence shows he turned his brother's solo-armed attack on an unarmed man to a two-on-one fight, he willingly participated in, at the very least, implied malice murder. Accordingly, we conclude there was no duty to instruct on involuntary manslaughter.[11]

XIV

*Senate Bill No. 1437*

In a supplemental brief, Joseph contends his murder conviction should be reversed because he is entitled to retroactive application of Senate Bill No. 1437, which invalidates two possible sources of liability for first degree murder, murder as a natural and probable consequence of assault with a deadly weapon as either a conspirator or an aider and abettor.

"Senate Bill [No.] 1437 was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.] Substantively, Senate Bill [No.] 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723 (*Martinez*).)

"Senate Bill [No.] 1437 also adds . . . section 1170.95, which allows those 'convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . .' "

---

**11** Since the lesser included offense instruction was not warranted, we need not determine if any error here was invited.

40

(*Martinez, supra*, 31 Cal.App.5th at p. 723.) Section 1170.95 requires that a trial court determine whether the defendant has made a prima facie showing for relief, and conduct a hearing where the parties may "offer new or additional evidence." (§ 1170.95, subds. (c), (d).)

As previously discussed in resolving several of Joseph's other attacks on his first degree murder conviction, the jury was appropriately instructed that liability for murder under a natural and probable consequences theory, whether as an aider and abettor or as a conspirator, was limited to second degree murder. The jury could not find him liable for first degree murder except by finding beyond a reasonable doubt premeditation and deliberation, and substantial evidence supports this verdict. Since the jury could not have based its verdict under a natural and probable consequences theory, Senate Bill No. 1437 is inapplicable to Joseph's conviction, even assuming the measure applies retroactively on appeal. (See *Martinez, supra*, 31 Cal.App.5th at pp. 729-730 [retroactive relief under Sen. Bill No. 1437 limited to § 1170.95 petition process].)[12]

XV

*Self-Defense and Imperfect Self-Defense*

Alex's trial counsel argued in opening that Alex killed in self-defense or imperfect self-defense. The trial court refused his request to instruct on self-defense and imperfect self-defense, but granted his request for instruction on voluntary manslaughter in the heat of passion. Alex contends the trial court erred in refusing his requested instructions.

---

[12] While this appeal was pending, Joseph filed a section 1170.95 petition, which the trial court denied, and he appealed to this court in case No. C089047. Appellate counsel in that case filed a *People v. Wende* (1979) 25 Cal.3d 436 brief, and we subsequently granted defendant's position to consolidate that appeal with this one. Our resolution of Joseph's Senate Bill No. 1437 contention in this case satisfies the *Wende* standard for reviewing the appeal in case No. C089047, and we shall affirm the judgment in that case.

41

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. [Citation.] We review the trial court's decision de novo." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) " 'To justify an act of self-defense . . . , the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him. [Citation.]' [Citation.] The threat of bodily injury must be imminent [citation], and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]' [Citations.]" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065.)

A person who kills someone with an actual but unreasonable belief that he or someone else is in imminent danger of great bodily injury or death is guilty of voluntary manslaughter rather than murder under the theory of imperfect self-defense. (*People v. Simon* (2016) 1 Cal.5th 98, 132.) Imperfect self-defense voluntary manslaughter is a lesser included offense of murder, so the trial court has a duty to instruct if substantial evidence supports this theory. (*People v. Birks* (1998) 19 Cal.4th 108, 118.)

Alex's claim is based on Hernandez's DNA being on the handles of both golf clubs found outdoors. He asserts the jury could reasonably conclude from this evidence that Hernandez swung the clubs at Alex. Alex notes a third golf club was found in Hernandez's residence, a place that neither Alex nor Joseph entered. He also finds support in the presence of the defendants' DNA on the handle of the fishing rod while Hernandez's was on the shaft. According to Alex, this could support a reasonable doubt in the jury's mind regarding the prosecutor's theory that defendants brought a knife to the fight and were the initial aggressors.

"The concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined. We have explained that 'the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked

by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances.' [Citation.]" (*People v. Valencia* (2008) 43 Cal.4th 268, 288.)

There is no evidence that Hernandez started the combat that led to his death. Alex had a motive to attack Rodriguez, who accused him of being a snitch. Either Alex or both defendants threatened to kill Hernandez and Rodriguez when defendants drove by them as they stood in front of the restaurant. Alex switched positions in the truck with Joseph, and drove the truck to Hernandez's residence, where he got out, challenged them to get out of the residence, and proceeded to damage the place until Hernandez came out. While the eyewitness testimony was not consistent, there was no eyewitness testimony that Hernandez either came out with a weapon or employed a weapon during the incident. The eyewitness testimony regarding the use of weapons shows them to be employed by defendants or by Rodriguez using the fishing rod. Likewise, the forensic evidence shows that all wounds on Hernandez were of a defensive nature.

In light of the overwhelming other evidence that Alex was the aggressor with Hernandez acting defensively and not employing any weapon, neither the presence of Hernandez's DNA on the golf clubs and the fishing rod nor the presence of the third golf club in his residence supports instruction on self-defense or imperfect self-defense.

XVI

*Franklin Hearing*

Alex contends in a supplemental brief, and the Attorney General concedes, that remand is required for a hearing to permit him to make a record of information that will be relevant at his future youth offender parole hearing. We accept the concession.

Alex was born in July 1995, making him 19 years old when the crime was committed. As relevant here, section 3051 provides that persons who were 25 years of

43

age or younger when they committed their controlling offense are eligible for youth offender parole hearings during their 25th year of incarceration. In *Franklin*, *supra*, 63 Cal.4th at pages 272, 277, after the defendant was sentenced to 50 years to life in prison for a murder he committed when he was 16 years old, the Legislature enacted sections 3051 and 4801, which entitled the defendant to a youth offender parole hearing. Our high court remanded the case for the limited purpose of determining whether the defendant was afforded an adequate opportunity to make a record of information that will be relevant to his future youth offender parole hearing. (*Franklin,* at pp. 284, 286-287.) Here, no evidence relevant to defendant's childhood and background was presented at his sentencing hearing. Therefore, as in *Franklin*, a limited remand is appropriate for the purpose of allowing defendant to make a record that will be relevant to his future youth offender parole hearing.

## DISPOSITION

In case No. C082126, the matter is remanded to the trial court for the purposes of allowing Alex to make a record of information that will be relevant to his future youth offender parole hearing. The judgment is otherwise affirmed.

In case No. C089047, the judgment is affirmed.

/s/
BLEASE, Acting P. J.

We concur:


/s/
MAURO, J.


/s/
RENNER, J.